**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

**UNITED STATES OF AMERICA**

    **Plaintiff,**

    v.                                 Case No. 1:18-cr-147
                                        JUDGE DOUGLAS R. COLE

**ANTWAN RELIFORD,**

    **Defendant.**

## OPINION AND ORDER

This cause is before the Court on Defendant Antwan Reliford's original Motion to Suppress (Doc. 35) and his Supplemental Motion to Suppress (Doc. 51).[1] In both Motions, Reliford requests that the Court suppress (1) all evidence seized from a November 7, 2018, search of 5192 Holland Drive, Cincinnati, Ohio 45232; and (2) all statements that Reliford made during a custodial interrogation on November 13, 2018. The Court held a hearing on the Motions on April 15, 2021, and they are now ripe for the Court's decision. For the reasons below, the Court **DENIES** Reliford's Motions.

### BACKGROUND

Officers with the Hamilton County Heroin Task Force began to investigate Reliford after an incident that occurred on August 16, 2018, at the Brass Rail Bar in

---

[1] Reliford's Supplemental Motion (Doc. 51) largely makes the same arguments as his original Motion (Doc. 35) does, though the Supplemental Motion clarifies and bolsters those arguments. Reliford submitted his Supplemental Motion with new counsel after counsel who submitted his original Motion withdrew from the case.

Norwood, Ohio. A group of four friends had purchased what they believed to be cocaine from a man known to them only as "Bodie." The substance turned out not to be cocaine but rather fentanyl (or some combination of substances containing fentanyl). All four friends overdosed; two of them died and two of them had to be revived.

About a week later, a confidential source told officers that he had been purchasing cocaine from a man named Bodie for the past two months. The confidential source gave the officers a phone number and physical description of Bodie. The phone number provided a fortuitous link to Reliford: Reliford had used the number to report an unrelated theft to the Norwood Police Department, so the number (and its association with Reliford) had been saved in the Department's files.

Both the confidential source and one of the surviving overdose victims positively identified a photo of Reliford as the person known to them as Bodie. And a search on Facebook for Reliford further revealed that Reliford had given himself a nickname: "King Bodie."

The officers had their suspect; now they wanted more evidence. Once again, the confidential source would prove useful. Operating under the direction of the Task Force, the confidential source purchased cocaine from Reliford six times between August 29, 2018, and October 30, 2018.

After the purchases, on November 5, 2018, Officer Holden sought and obtained a search warrant from a federal Magistrate Judge for 5192 Holland Drive, where Reliford had been spending his nights. Officers executed the warrant on November 7,

2018. During the search, Task Force Officers recovered two revolvers, one pump-action shot gun, and a plastic bag containing multiple bindles of suspected controlled substances. Reliford was arrested less than a week later in Louisville, Kentucky. He was then taken to the DEA field office and interrogated by Task Force officers after they gave him a Miranda warning.

Federal prosecutors eventually brought Reliford before a grand jury, which indicted him on numerous drug and firearms offenses. Reliford now moves to suppress (1) the evidence obtained from the search of 5192 Holland Drive; and (2) the statements he made during his custodial interview.

## LAW AND ANALYSIS

**A. Reliford's Motion to Suppress Evidence from the Residence is Denied.**

**1. The Officers Had Probable Cause to Search the Residence.**

Reliford first argues that the Court should suppress the evidence obtained from the search of 5192 Holland Drive. According to Reliford, Officer Holden's affidavit lacked probable cause to justify the search of the residence because the affidavit did not establish "any nexus between any alleged drug trafficking and the residence." (Reliford Suppl. Mot to Suppress, Doc. 51, #317[2]). In making this argument, Reliford emphasizes the fact that each of the controlled purchases that Holden recounted in his affidavit occurred away from the residence.

Reliford's argument implicates a vexing area of Fourth Amendment jurisprudence. It is well settled that there must "be a nexus between the place to be

---

[2] Refers to PageID#

searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). But it is often unclear what constitutes a sufficient showing of nexus in any given case.

The Sixth Circuit recently explored the source of this confusion in an opinion that provides helpful clarity to this area of law. *See United States v. Reed*, 993 F.3d 441 (6th Cir. 2021). The underlying problem, as *Reed* explained, is that the nexus inquiry implicates two competing Fourth Amendment principles. *Id.* at 444. The first principle is that "probable cause to arrest a suspect for a crime does not necessarily create probable cause to search the suspect's home." *Id.* The second principle is that "the probable-cause test allows officers to make common-sense conclusions about where people hide things." *Id.*

The tension between the two has given rise to arguably competing lines of cases. Channeling the first principle, for example, the Sixth Circuit has rejected "the proposition that the defendant's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home." *United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016) (quoting *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005)). But, channeling the second principle, the Sixth Circuit also has observed that, "in the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) (quoting *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998)).

Given the tension between such statements, the Sixth Circuit has "reconciled [its] caselaw in fact-specific ways." *Reed*, 993 F.3d at 448. It has done so by holding

4

that "a court need not rely on a known drug dealer's status *alone* whenever other evidence (besides the drug dealer's living there) links drug dealing to the dealer's home." *Id.* So, for example, the Sixth Circuit has found a probable-cause nexus to search a drug dealer's home when drugs were found in the drug dealer's car near the home. *See United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009). The Sixth Circuit also has found this nexus when a suspect caught with drugs lied about his home address. *See United States v. Caicedo*, 85 F.3d 1184, 1193 (6th Cir. 1996).

Thus, the question here is whether there is "other evidence" (besides Reliford's status as an alleged drug dealer, and the fact that he lives at the residence) that links Reliford's drug dealing to the residence. There is.

True, Holden's affidavit indicated that each of the controlled purchases of drugs occurred away from Reliford's residence. But for the sixth controlled purchased, the affidavit stated that, after receiving a call from the confidential source, officers observed Reliford exit the residence and enter a car registered to a woman named Christina Collins. (Gov't Ex. A, Doc. 52-1, #351–52). Collins then drove Reliford to a separate location and, after dropping him off, Reliford proceeded to sell illegal drugs to the confidential source at a gas station directly across the street from that location. (*Id.* at #152). In other words, the affidavit alleged that Reliford went straight from the residence that was the subject of the warrant to another location and then, after crossing the street, sold illegal drugs. That at least suggests that he brought with him from the residence the drugs he sold at the gas station, which is enough, under Sixth Circuit caselaw, to establish a probable-cause nexus between Reliford's drug dealing

5

and the searched residence. *See United States v. Coleman*, 923 F.3d 450, 457–58 (6th Cir. 2019); *United States v. Houser*, 752 F. App'x 223, 226–27 (6th Cir. 2018); *United States v. Jenkins*, 743 F. App'x 636, 644 (6th Cir. 2018).

Consider *Coleman*. There, officers observed an active drug trafficker "drive directly from his condo to the site of the most recent buy, less than two weeks before the warrant issued." 923 F.3d at 457. According to the Sixth Circuit, that "was sufficient … to provide a reasonable inference that [the drug trafficker] transported narcotics from his residence to the location of the cocaine sale." *Id.* The officers observed much the same sequence of events in *Houser*, 752 F. App'x at 226–27 (6th Cir. 2018), and in *United States v. Jenkins*, 743 F. App'x at 644. That is, officers observed a known drug dealer leave a residence, go directly to the site of a controlled buy, and engage in an illegal drug sale. Granted, the drug dealers in *Houser* and *Jenkins* also returned immediately to the residence immediately after completing the sale, whereas the affidavit here does not allege that Reliford did the same. But why should it make a difference whether the drug dealer immediately returned to his home or went anywhere else? The drugs were already sold by that point. It is where the dealer came *from*, not where he is headed *to*, that would be the likely location of where the drugs are stored. And what really matters is what the drug dealer did between the time he left his house and the time he sold the drugs. A stop at a warehouse location, for example, may break the nexus link. But in *Coleman*, *Houser*, and *Jenkins*, the dealer went directly from the residence to the site of the drug sale.

That supported a reasonable inference that illegal drugs would be found at the residences. The same is true here.

**2. *Leon*'s Exception Applies to the Warrant Here.**

Even if Holden's affidavit had lacked probable cause (and, to repeat, it didn't), *United States v. Leon*'s exception to the exclusionary rule would doom Reliford's Motion to Suppress. 468 U.S. 897 (1984). That inexorably follows from the Sixth Circuit's recent decision in *Reed*, which also dealt with a nexus issue arising from law enforcement's search (pursuant to a search warrant) of a drug dealer's residence. In *Reed*, the government appealed a district court's decision to suppress evidence obtained from the search. The government did not challenge the district court's holding that there was an insufficient nexus between the alleged drug activity and the residence to support probable cause. Instead, the government argued that exclusion of the evidence was improper under *Leon's* exception. The Sixth Circuit agreed with the government for four reasons that the Court lists below in explaining why *Leon*'s exception also applies to Reliford's Motion.

Reason one: "[Reliford] does not dispute two critical points." *Reed*, 993 F.3d at 451. The first point is that the "police had probable cause to believe that [Reliford] was a drug dealer who had engaged in recent drug sales." *Id*. Reliford sold drugs to the confidential source on six occasions between September 6, 2018 and October 30, 2018. And Officer Holden submitted an affidavit detailing these controlled buys on November 5, 2018, less than a week after the last one occurred. The second point is that the "police had probable cause to believe that [Reliford] lived at the residence."

7

*Id.* Data obtained from a federal search warrant for Reliford's cell phone revealed that he had been spending his nights at the residence. Moreover, "[o]n several occasions while conducting surveillance of the residence, [officers] observed the same 2012 silver Chevrolet Malibu that Reliford used during 2 of the [controlled buys] parked on the street in front of" the residence. (Gov't's Ex. A, Doc. 52-1, #351). "These undisputed points go a long way toward showing that *Leon*'s good-faith exception applies." *Reed*, 993 F.3d at 451.

Reason two: "[Officer Holden] could reasonably conclude that [Reliford's] ongoing drug dealing sufficed to trigger [the Sixth Circuit's] 'well established' principle that if there is probable cause to suspect an individual of being an ongoing drug trafficker, there is a sufficient nexus between the evidence sought and that individual's home." *Reed*, 993 F.3d at 451 (quoting *Feagan*, 472 F. App'x 382, 390 (2012)). And an officer could reasonably reach that conclusion largely independent of the amount of drugs the officer believes that the person has trafficked. That is because Sixth Circuit caselaw leaves "unclear the amount of drug activity required to invoke this nexus principle." *Id.* At times the Sixth Circuit has "suggested that it applies to 'a large, ongoing drug trafficking operation.'" *Id.* (quoting *United States v. Brown*, 828 F.3d at 383 n.3). At other times, the Sixth Circuit has "suggested that it can apply based on 'recent, reliable evidence of drug activity.'" *Id.* (quoting *United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018)). Officer Holden's affidavit showed at least the latter. "In light of [the Sixth Circuit's] 'unsettled jurisprudence' regarding the amount of required drug activity, [Officer Holden] did not behave recklessly by

relying on the [magistrate] judge's conclusion that [Reliford's] drug activity sufficed." *Id.* So, say, hypothetically, that officers had not observed Reliford going directly from his residence to the site of the last controlled drug buy. *Reed* suggests that, even then, it would have been enough that Holden's affidavit showed, "recent reliable evidence of drug activity," to trigger *Leon*'s exception. *Id.* (quoting *McCoy*, F.3d at 418.

Reason three: "[Officer Holden] did not rely on [Reliford's] drug activity alone. His affidavit described his experience investigating drug crimes," *id.*, noting that he has "conducted and participated in the investigation of numerous criminal offenses." (Gov't's Ex. A, Doc. 52-1, #343). Those investigations included "the unlawful importation, possession with intent to distribute and distribution of illegal substances." (*Id.*). "And [Holden] indicated his belief that probable cause existed to search [Reliford's] home was based, in part, on this experience." *Reed*, 993 F.3d at 452. As *Reed* recognized, many "courts have highlighted an 'affiant officer's experience that drug dealers keep evidence of dealing at their residence' as an additional reason to find probable cause to search the drug dealer's home." *Id.* (quoting *United States v. Sumlin*, 956 F.3d 879 (6th Cir. 2020)); *see also United States v. Goward*, 188 F. App'x 355, 358 (6th Cir. 2006); *United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007). Thus, here, Holden's "experience at least provides another reason to trigger *Leon*'s exception." *Reed*, 993 F.3d at 452; *see also United States v. Acosta-Barrera*, 819 F. App'x 366, 372 (6th Cir. 2020); *United States v. Ardd*, 911 F.3d 348, 352 (6th Cir. 2018); *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994).

9

Reason four: Courts cannot lose sight of the "the fact-intensive nature of the probable cause inquiry in known drug dealer cases[.]" *Reed*, 993 F.3d at 452. (quoting *Brown*, 828 F.3d at 384). As a result, "officers will often find it difficult to know how the general standard … applies in the precise situation encountered." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Given the Sixth Circuit's own struggle to "reconcile [its] caselaw in these frothy nexus waters, how can [courts] expect nonlawyer officers to know better than judges that their affidavits do not suffice except in obvious cases?" *Reed*, 993 F.3d at 441 (quotations omitted). Thus, the "imprecise nature" of this inquiry supports the [Court's] conclusion that [Holden's] actions fall within the range of reasonableness permitted by *Leon*." *Id.* (quotation omitted).

As indicated above, these are the same four reasons that *Reed* pointed to in explaining why *Leon*'s exception applied in that case. As *Reed* is a published Sixth Circuit decision with facts materially indistinguishable from those here, at least on those four key inquiries, *Reed* controls the Court's resolution of the issue here. Thus, even leaving aside the Court's conclusion that probable cause supported the warrant here, *Reed* defeats Reliford's Motion based on *Leon*'s exception.

**B.    Reliford's Motion to Suppress His Statements from the Custodial Interview is Denied.**

That just leaves Reliford's *Miranda* argument. According to Reliford, "[a]t the beginning of the interrogation, [he] expressed [his] confusion as to the officers about the circumstances surrounding the interrogation." (Suppl. Mot. to Suppress, Doc. 51, #321). Then, about 15 minutes after (1) officers read him his *Miranda* rights and

10

(2) he signed a form acknowledging he understood those rights, Reliford asked "when he could speak to a lawyer." (*Id.*). "The officers responded that he would be appointed in the next day or so." (*Id.*). Reliford "then put his head on the table in what," he argues, could "only be interpreted as an expression of despair." (*Id.*). These facts, Reliford contends, demonstrate that he did not validly waive his *Miranda* rights at the outset of the interview. That is so, Reliford says, because he "was not aware that he had the *immediate* right to counsel before he was questioned further." (*Id.*). For example, "[i]n asking *when* he would be able to speak with a lawyer, [he] made clear that he was not aware that his right to counsel had already attached and was not aware that he could choose to speak only with counsel present." (*Id.*). Thus, contends Reliford, he did not "knowingly," "voluntarily," and "intelligently" waive his *Miranda* rights at the beginning of the interview. *Edwards v. Arizona*, 451 U.S. 447, 483 (1981). Alternatively, Reliford argues that even if he did validly waive his *Miranda* rights, that the waiver was withdrawn at the time he asked when he could speak with a lawyer.

The Court disagrees with both of Reliford's arguments. Beginning with the first argument, the Court finds that Reliford *did* knowingly, voluntarily, and intelligently waive his *Miranda* rights. The Court has reviewed a video of the interview, which both parties submitted as evidence at the suppression hearing. It is true that Reliford says he is "confused" near the start of the interview. But it is also clear from the video that, contrary to his argument now, Reliford's confusion did not extend to his understanding of the rights he was waiving. Rather, he said he was

11

confused as to *why* he had been arrested—a confusion that dissipated almost immediately when the officers explained why the warrant had issued.

That confusion as to why he was detained is not the same as saying, as Reliford now suggests, that he wasn't in full possession of his mental faculties when he signed the *Miranda* form. To the contrary, the officers asked him a series of questions at the start of the interview that confirmed he was lucid and understood what the officers were asking of him. For example, the officers asked what his first and last name were, how old he was, and what his social security number was. Reliford had no trouble answering nearly every question he was asked. The officers also asked Reliford if he was under the influence of alcohol or drugs, to which he unequivocally responded, "No." Again, nothing in what Reliford said or did during the interview suggests that he was mentally incapable of knowingly, intelligently, and voluntarily waiving his *Miranda* rights.

Reliford's question about when he could speak to a lawyer also does not indicate that he failed to understand, as he argues, that his right to counsel "had already attached." (Suppl. Mot. to Suppress, Doc. 51, #321). Again, the video of the interview provides overwhelming evidence to the contrary. Near the top of the interview, the officers explained that they were conducting a criminal investigation and so they were going to read Reliford his rights. One of the officers proceeded to read Reliford his *Miranda* rights off a form, and Reliford appeared to be following along. After reading Reliford his rights, the officer asked Reliford if he understood his rights. Reliford said he did and then went on to sign the *Miranda* form, expressly

12

acknowledging that he understood his rights. As relevant here, the form notified him that he had the "the right to talk to a lawyer for advice before [the officers] ask[ed] [him] any questions and to have [the lawyer] with [him] during questioning." (Gov. Ex. 3). The form further notified him that if he could afford a lawyer, one would be appointed for him before any questioning if he wished. On top of that, the form informed him that even if he decided to answer questions now without a lawyer present, he would still have the right to stop the questioning at any time. And it informed him that he had the right to stop the questioning at any time until he spoke with a lawyer.

Reliford's question did not indicate that he failed to understand his rights. Indeed, Reliford's question was aimed at something not addressed by the *Miranda* warning: exactly *when* he would be provided a lawyer. Just because Reliford was unsure of *when* a lawyer would arrive does not mean he was unsure that he could speak to a lawyer before continuing to answer the officers' questions. It seems Reliford may have simply been trying to weigh the costs and benefits of cooperating with law enforcement right then and there, as opposed to further delaying things by asking for a lawyer before continuing with the questioning.

Nor does Reliford placing his head on the table reasonably call into question whether he understood his rights. He mentioned that his head had been hurting, and it seems he may have been resting his head to gain some relief. It also seems likely, based on the video, that it was an outward manifestation of the seriousness of the situation sinking in. After all, by this point in the interview, it was quite clear that

13

the officers had amassed a great deal of evidence that Reliford had sold drugs laced with fentanyl that had caused the death of two people.

To recap: Reliford was read his *Miranda* rights, asked if he understood his *Miranda* rights, and indicated that he understood his rights both with a verbal response and by printing his name on a form that expressly acknowledged as much. Nothing that Reliford said or did during the interview calls into question whether he knowingly, voluntarily, and intelligently waived his rights when, despite acknowledging that he understood his rights, he proceeded to answer the officers' questions. To the contrary, throughout the interview, Reliford "had a conversational tone, seemed to understand his situation, and responded appropriately to questions." *United States v. Fein*, 843 F. App'x 765, 770 (6th Cir. 2021).

Finally, Reliford's question about when he could speak to a lawyer did not constitute a "clear and unequivocal" assertion of his *Miranda* rights necessitating the end of interrogations. *United States v. Amawi*, 695 F.3d 457, 485 (6th Cir. 2012). Again, common sense tells us that asking *when* one can speak to a lawyer is not the same as stating that one *wants* to speak to a lawyer. Indeed, the fact that everyone agrees that the utterance here was a question, and not an assertion, is probably reason enough to reject Reliford's argument. Sixth Circuit caselaw likewise rejects the notion that utterances like "I'm going to wait," and "is there a lawyer," as constituting an invocation of one's *Miranda* rights. *Id.* According to that court, "mentioning the prospect of talking with an attorney, or waiting to talk until one is

present is not sufficient to put the agent on notice that a suspect has invoked his right to remain silent." *Id.*

The statement (or, more accurately, question) here is no more (and probably much less) an invocation of one's *Miranda* rights than the statements that the Sixth Circuit found insufficient in *Amawi*. The Court thus rejects Reliford's argument.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Reliford's Motion to Suppress (Doc. 35) and his Supplemental Motion to Suppress (Doc. 51).

**SO ORDERED.**

May 17, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**